UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

Docket No. 6:12-cr-1429

. . . . . . . . . . . . . . . ..
UNITED STATES OF AMERICA         :
                                 :
            Plaintiff            :        Orlando, Florida
            v.                   :        September 17, 2012
                                 :        10:00 a.m.
BRUCE LEE JENNINGS               :
                                 :
            Defendant            :
. . . . . . . . . . . . . . . ..

TRANSCRIPT OF INITIAL APPEARANCE/DETENTION HEARING

BEFORE THE HONORABLEGREGORY J. KELLY

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Myrna Mesa

For the Defendant:          Steve Langs

Proceedings recorded by tape-recording, transcript produced

by computer-aided transcription.

PROCEEDINGS

THE DEPUTY CLERK:  Case number 6:12-1429, United States of America vs Bruce Lee Jennings.

Counsel, please state your appearances for the record.

MS. MESA:  Good morning, Your Honor.  Myrna Mesa for the United States.  Next to me is Joseph Grey, Homeland Security investigations.

THE COURT:  Good morning.

MR. LANGS:  Good morning, Your Honor.  Steve Langs, Federal Defender's Office.  The defendant appears to my right.

THE COURT:  Good morning.  All right.  Just by way of a brief background, I understand that the defendant and Ms. Mesa did come in on Saturday and meet with Magistrate Judge David Baker, but there was no recording made of that meeting so I'm going to treat this as the defendant's initial appearance.

So, Mr. Jennings, this is your initial appearance with respect to the criminal complaint that's been filed against you.  The purpose of the hearing today is to advise you of your rights, advise you of the allegations against you, and we'll address bond as well.

Sir, you're advised you have the right to remain silent.  You're not required to make any statement whatsoever.  I want to caution you that if you do make a

statement the government may then use that against you in
order to prosecute its case.  In addition you can invoke
your right to remain silent at any point in time.  So keep
that in mind.

You also have the right to counsel.  If you cannot
afford counsel, counsel will be provided for you at no cost.

You have the right to confer with your counsel before
any questioning by the authorities may begin.  You have the
right to have your counsel present during any questioning
and any lineup and in all court proceedings.

I just received your financial affidavit which is dated
September 15th.  I take that as a request for
court-appointed counsel.  And, Mr. Langs, in reviewing it I
see that he's listed his income, assets, and debts.  There's
a home that's listed as being valued at $950,000.  Is that
the home in Daytona that was with the hangar, et cetera,
attached to it that's addressed in the 11th Circuit opinion?

MR. LANGS:  I don't know about that, but I think
you're referring to the single residency home that he does
have.  And my understanding is there's some question as to
whether or not he continues to go through bankruptcy at this
point.  So I don't know the status of the home, I don't know
the status of the bankruptcy or --

THE COURT:  That's a little bit different though.
I mean what I'm inquiring about is this home.  Is this home

1  in his name?

2          MR. LANGS:  It's in his name in Volusia County.

3          THE COURT:  All right.  Well, you probably need to

4  talk about that because, I mean, this looks to me just on

5  its face like there's a $950,000 house with no debt on it,

6  which would definitely make him not a pauper for purposes of

7  court-appointed counsel.

8      So, since I'm at the point in this proceeding where I

9  usually would make the determination about whether or not he

10  qualifies for court-appointed counsel, why don't you confer

11  with your client, talk to him about that, otherwise I can

12  ask him questions.  I mean, but I'll get -- since you're

13  just coming to the case I'll give you time to talk with him

14  about that.  Okay?

15          MR. LANGS:  That's fine, Your Honor.  My only

16  suggestion would be if that's his only asset, and it's my

17  understanding that it would be, that's pretty much a liquid

18  in today's market.  Under the circumstances I think that

19  might, at least short-term, qualify to represent him until

20  he would be able to get a chance to get his hands on any

21  money.  But I can certainly --

22          THE COURT:  I'm not saying that I wouldn't appoint

23  counsel for purposes of this hearing.

24          MR. LANGS:  Okay.

25          THE COURT:  But what I'm trying to determine is

1  whether I'm going to go ahead and appoint counsel beyond

2  this hearing.  I mean, and either way the defendant may have

3  an obligation to reimburse for court-appointed counsel.

4  But, you know, I guess I have a different view of you --

5  than you do with respect to the issue of liquidity.

6      MR. LANGS:  What I've done in the past, Your

7  Honor, is I've asked for just a short-term appointment for

8  purposes of today and ask for another hearing before the

9  magistrate, you know, in a week or two for counsel

10  determination.  And that would give my office a chance to

11  follow up with him and his wife.  And if we don't have any

12  issues, which (inaudible) we shouldn't go forward if we want

13  to continue to fight for representation, we could certainly

14  do that.

15      THE COURT:  Well, I mean you're right.  I can do

16  that.  I can go -- as I said, I would appoint counsel for

17  purposes of this hearing.  If you want additional time to

18  meet with him and talk with him about the issue, that's

19  fine.  I do agree with you.  He's definitely entitled to

20  counsel at this hearing.

21      MR. LANGS:  If you'd like, Your Honor, I would so

22  formally move.  I'll ask for an ore tenus motion for counsel

23  determination and ask for Wednesday or Thursday of this week

24  if the Court has time for a hearing on that --

25      THE COURT:  Okay.  Does the government have a

```
 1   position on this or no?
 2           MS. MESA:  Yes.  We believe that the defendant has
 3   the assets to appoint his own --
 4           THE COURT:  Is it based on the house or is it
 5   based on something else?
 6           MS. MESA:  It's based on the house.
 7           THE COURT:  Okay.  All right.  Well, I'm seeing
 8   the same -- the same issue.  So, all right.  So the ore
 9   tenus motion for court-appointed counsel at this point is
10   granted.  We'll go ahead and set a hearing later this week.
11       Does the government agree with that to have a
12   hearing --
13           MS. MESA:  That's fine, Your Honor.
14           THE COURT:  -- in terms of Wednesday or Thursday?
15       We'll be able to make a better determination as to
16   whether or not you qualify for court-appointed counsel
17   moving forward in the case.
18       But you'll have the public defenders acting as your
19   court-appointed counsel for purposes of the hearing today
20   and moving forward until such time as the Court may make a
21   different determination.
22       And Mr. Langs obviously is acting as your counsel here
23   today for this hearing.  So that's what we'll do with
24   respect to the appointment of counsel.
25       All right.  Mr. Langs, have you and your client
```

1  received a copy of the complaint?

2          MR. LANGS:  We have, Your Honor.

3          THE COURT:  And is there any issue of identity?

4          MR. LANGS:  No, sir.

5          THE COURT:  All right.  Ms. Mesa, if you will just

6  give us a brief procedural background for the record.  And

7  since I wasn't here, if you could address what occurred on

8  Saturday as well.

9          MS. MESA:  Yes, sir.

10          THE COURT:  And then if you would summarize the

11  charge the defendant's facing as well as the associated

12  penalties and address bond.  Okay?

13          MS. MESA:  Yes, Your Honor.

14      On Saturday Mr. Jennings, the defendant in this case,

15  was arrested and brought in for an initial appearance.

16  Judge Baker saw him for that initial appearance, told him

17  what his rights were.

18      There was a request for court-appointed counsel.  At

19  that point Judge Baker let the defendant know that he didn't

20  believe that he was entitled to court-appointed counsel

21  based on the financial affidavit but that he could readdress

22  it on Monday, which is today.

23      At that point, during that initial appearance Judge

24  Baker requested the attorney -- I mean the government to

25  state what their position was with regard to detention.  We

requested a detention hearing on the basis of that he was a
flight risk and a danger to the community.  And at this
moment in time that's where the hearing ended.  So we're
here today, we've done the initial appearance again, the
same issues have arisen.

     And the criminal complaint has alleged that the
defendant on or about the 22nd of 2012 to September 14,
2012, in Volusia County, did distribute and possess child
pornography using the interstate or foreign commerce by
computer Internet.  It is a violation of 2252(A)(2)(a) and
(A)(5).

     With regard to the maximum penalty for distribution, it
is no less than five years to 20 years in the Bureau of
Prisons, $250,000 fine, five years to life of supervised
release.

     With regard to possession of child pornography it's no
more than 10 years in the Bureau of Prisons, $250,000 fine,
five years to life supervised release.

          THE COURT:  All right.  And the government is
seeking detention on the basis stated?

          MS. MESA:  That's correct, Your Honor.

          THE COURT:  All right.  Mr. Langs, have you had
time to talk with your client about his right to a
preliminary hearing and also a hearing on the issue of bond?

          MR. LANGS:  I have, Your Honor.  We would request

both.  We would like to have a short preliminary hearing as

well as a request for release, and we're prepared to go

forward today.

THE COURT:  You're prepared today.

Ms. Mesa, are you prepared?

MS. MESA:  I am not prepared to go forward with

the preliminary examination but certainly with the bond

hearing.

THE COURT:  Okay.  All right.  No presumption

applies here with respect to --

MS. MESA:  There is a presumption.

THE COURT:  There is?

MS. MESA:  The presumption applies with the

distribution charge.

THE COURT:  Oh, the distribution.  All right.

All right, then, Mr. Langs.  We'll hear from you.  And

in terms of the preliminary hearing we'll set that later

this week when we have the hearing on the issue of

court-appointed counsel moving forward.  All right?

MR. LANGS:  Just in light of the presumption and

the (inaudible) weight of the evidence, is it okay if I call

Agent Grey to fill in some of the blanks and (inaudible) as

a witness?

THE COURT:  Sure.

MR. LANGS:  If I may, Your Honor, I call Agent

1  Grey.

2  THE COURT:  All right.

3  **(WITNESS SWORN)**

4  THE WITNESS:  I do.

5  THE DEPUTY CLERK:  Please be seated and state your

6  name for the record.

7  THE WITNESS:  Joe Grey, G-E -- G-R-E-Y, excuse me.

8  **DIRECT EXAMINATION**

9  BY MR. LANGS:

10  Q     And, Mr. Grey, could you just kind of merely tell us

11  who you are, who you work for --

12  A     Sure.  I'm a special agent --

13  Q     -- your basic duties and responsibilities (inaudible).

14  A     Sure.  I'm a special agent with the Department of

15  Homeland Security, Homeland Security investigations.  We

16  investigate criminal and administrative violations of the

17  United States Code.

18  Q     How long have you been doing that?

19  A     Since October 2007.

20  Q     And where is your base of operations?  Where do you

21  usually work from?

22  A     My office covers Brevard and Volusia Counties.

23  Q     In terms of Mr. Jennings, you are the individual who

24  filled out the complaint in this case?

25  A     Correct.

Q    And if you can -- you re-adopt the statements that you

made in that complaint for purposes of this hearing,

correct?

A    In the complaint affidavit.

Q    In the complaint affidavit, right.

A    Correct.

Q    If you can summarily, just kind of give us an idea of

your investigation, how Mr. Jennings came to your attention

and what you did.

A    Mr. Jennings actually came to the attention of one of

our task force agents.  He was conducting an online

investigation, noticed a certain IP address that was

offering images of child pornography for downloader sharing.

That IP address was connected to -- for single-source

download -- images of child pornography were downloaded from

that IP address.  Subsequent investigation revealed that

that IP address at that -- at those times belonged to Mr.

Jennings.

Q    When you say "subsequent investigation," what exactly

do you mean there?  Getting a subpoena for the IP carrier?

A    Correct, uh-huh.

Q    Fill that in, if you can.  Who was the carrier and how

did you find his address?

A    I believe it was AT&T, and the summons was submitted to

AT&T for the time and date specified during the download.

1   And those times and dates were returned as that IP address

2   belonging to Mr. Jennings.

3   Q    When you say "single-source download" what do you mean?

4   A    I mean that the law enforcement program connected to

5   that IP address solely and received those images from that

6   IP address.

7   Q    Did you yourself conduct that download?

8   A    No.

9   Q    Who did?

10  A    That was Task Force Agent Dan Ogden.

11  Q    And so I'm assuming Mr. Ogden came to you and said,

12  hey, listen, I have downloaded images of child pornography

13  from this specific IP address; is that --

14  A    Yes.  That's correct.

15  Q    Is it fair to say it that way?

16  A    Yep.  Uh-huh.

17  Q    All right.  So you have in the government's custody the

18  actual images that you downloaded from that IP address,

19  right?

20  A    That is correct.

21  Q    All right.  So when we say "download," this was

22  actually taken from the computer from which you seized --

23  well let me say this (inaudible).

24       You have the images downloaded from the computer you

25  took from Mr. Jennings?

A     Right.  We have the images that were the source of the

subject -- the subject of the single-source download, right.

Q     Okay.  So once you got your search warrant -- you got a

search warrant in this case, right?

A     Correct.

Q     And that search warrant was for Mr. Jennings' address,

correct?

A     That's correct.

Q     And this is the house in Volusia County that we've been

talking about, right?

A     That's right.

Q     When you got that, you and Mr. Ogden went to the

residence?

A     Actually Agent Ogden wasn't available so he wasn't

there.

Q     Who went with you?

A     Myself and Ken -- Agent Ken McClannahan (phonetic).

Q     All right.  So you and Agent McClannahan went to the

Volusia County home, right?

A     Uh-huh.

Q     And then when you got there, kind of fill us in, what

took place when you met with Mr. Jennings.

A     Sure.  Agent McClannahan and I knocked on the door.  We

spoke briefly with his wife, asked to speak with Mr.

Jennings.  A few minutes later he came out, we talked to

1  him, his wife stayed inside, and he essentially -- he

2  initially denied any knowledge of images of child

3  pornography or any intentional involvement in it.

4      At a certain point we asked if he would mind if he

5  would provide us consent to look at his computers.  He

6  stated that that would be okay but he wanted to go inside by

7  himself and talk to his wife first.

8      As he started to go inside we kind of felt like maybe

9  that wasn't the safest thing at that point and so we

10  executed the search warrant.  We told him we had a search

11  warrant.

12      We read him his Miranda Rights warnings and then -- and

13  then from there we spoke with Mr. Jennings and Mrs. Jennings

14  separately.

15  Q    And then what did Mr. Jennings tell you after you

16  advised him of his Miranda Rights?

17  A    He indicated that he understood those rights and that

18  he wished to continue to speak with me.  We spoke, he told

19  me that he had lied to me previously.  He told me where the

20  computer and the external drive were that would -- that were

21  going to have the images of child pornography on them.  He

22  indicated that he would have a lot of images and that he had

23  been doing it for a number of years.

24  Q    How many computers were there at the house?

25  A    I'm not sure that I have an exact number for you, but

1    they -- I'd have to refer back to the reports.  But the

2    primary images that are -- the computers that he was

3    indicating to me were the ones he most often used were a

4    laptop and an external drive that were in his vehicle.

5    Q    All right.  And my question's going to be how many

6    computers did you actually seize are in government custody,

7    and of those that you took how many of them as we sit here

8    in court right now have images of child pornography on them

9    or at least indicia of child pornography on them?

10   A    I'm not -- I don't think I can answer that right now

11   just because the forensic analysis is still ongoing.  I know

12   that the laptop and the external drive that were found in

13   his vehicle had images of child pornography on them.  There

14   were some other -- there was some other equipment in the

15   house that did as well, but that -- that analysis is still

16   ongoing.  These were just preliminary results.

17   Q    At least for purposes of today, you'll agree with me

18   what we're really talking about is the laptop and external

19   hard drive that we know for sure?

20   A    Right.  Right.

21   Q    Okay.  And then the remaining computers, we don't know

22   how many there are, two, three?

23   A    I can count them up for you if you want.

24   Q    If you can, just briefly.

25   A    Okay.  Actually it's in my -- it's in my other folder.

1  Q    That's okay.  We're dealing with at least --

2  A    It's going to be probably four or five computers,

3  various media, CDs, disks.

4  Q    And those have not been subject to forensic

5  examination?

6  A    No.

7  Q    Okay.  What do you think -- how many still images do

8  you think we're talking about at this point?

9  A    Still images?

10 Q    Still images.

11 A    Okay.  I'm not exactly accurate on that.  What we found

12 on scene was during the previous search on the laptop we

13 found over a hundred images and movies of suspected child

14 pornography, and on the external drive over 500 images of

15 suspected child pornography.

16 Q    How many videos do you think we're talking about?

17 A    I'm sorry, I just don't have a breakdown for you on

18 that.

19 Q    So roughly, fair to say a hundred to 500 images or

20 material containing images of child pornography as we sit

21 here in the court today, right?

22 A    Correct.

23 Q    All right.  And you obviously talked to his wife, Mrs.

24 Jennings?

25 A    I did.

Q    And did she have any statement for you or any answers? Was she able to fill in any blanks for you?

A    She was very cooperative.  She was very surprised. Other than that she wasn't really able to provide any substantive information about the crime at hand, but she was cooperative and she was -- talked to us.

Q    No online chats are involved in this case, right?

A    The information -- I don't have any information on that at this point.

Q    As far as you know Mr. Jennings wasn't chatting or communicating with Agent Ogden during his downloading --

A    No.

Q    Anything -- anything outside the possession of these images that we should be aware of that would go to his notion to distributing or possessing child pornography?  Is there anything else that would suggest to us above and beyond Mr. Jennings having these images on his computer?

A    I had received some information, but I had not talked to the source about it.  It was about Mr. Jennings' previous travel activities.

Q    All right.  So he had a passport, right?

A    Correct.

Q    But you've taken that; you've seized his passport, right?

A    Yes.

1  Q    Mr. Jennings is a U.S. citizen as far as you know,

2  correct?

3  A    Yes.

4  Q    So just to summarize then, would you agree with me that

5  this investigation included an undercover investigation,

6  online investigation into this shareware program, right?

7  This is a peer-to-peer case, correct?

8  A    Correct, uh-huh.

9  Q    And I think the complaint indicates the program being

10 used is Ares, A-R-E-S; is that right?

11 A    That was the law enforcement program we're using to do

12 the single-source download with him.

13 Q    What was the peer-to-peer program that Mr. Jennings was

14 using?

15 A    He said he was using LimeWire.  And I'm not sure that

16 -- he claimed he was not very familiar exactly with what he

17 was using, so we're still going through the process

18 obviously, the forensic analysis, to figure out what he was

19 using and when he was using it.

20 Q    But the single-source download then was taken from

21 Ares, which is a government-used software program, right?

22 A    Well, Ares -- no, Ares is not a government program.

23 Law --

24 Q    (Inaudible).

25 A    That's correct.

1   Q    All right.  But law enforcement uses it.

2   A    Yes.  Yes.

3   Q    And this is Mr. Jennings was using LimeWire?

4   A    That forensically is still to be determined, but that's

5   what he told me.

6   Q    And then so, again, just to kind of summarize here, Mr.

7   Ogden was the catalyst for an online investigation.

8   A    Uh-huh.

9   Q    He downloaded images from a particular IP address?

10   A    Correct.

11   Q    Using these peer-to-peer programs, correct?

12   A    Right.

13   Q    Based on that investigation you actually had child

14   pornography in your custody from this IP address, correct?

15   A    Yes.  That's correct.

16   Q    And then based on that you went out and found the

17   particular residential address, right?

18   A    That's correct.

19   Q    Whereupon you got your search warrant and went out to

20   the home and talked with Mr. Jennings, correct?

21   A    That is correct.

22   Q    If you can, describe where the home is.  Is it near a

23   school?  Is it near parks?  Is it a rural area?

24   A    It's about three-quarter miles from a middle school I

25   believe.  It's a gated community.  The school is not in the

gated community. It's across the street from it. It's a

fly-in community in Volusia County and Port Orange.

Q    One runway or two?

A    I'm not sure.

Q    The runway is not coming out of Mr. Jennings' driveway

though, right?

A    Actually he has a taxiway right to the runway.

Q    Okay. But it's a shared runway by most of the other

individuals?

A    Oh, right. Uh-huh.

        MR. LANGS: Nothing else, Your Honor. Thank you.

        THE COURT: All right. Ms. Mesa?

### CROSS-EXAMINATION

BY MS. MESA:

Q    Special Agent Grey, you talked about the images that

you found on the computer. Were you able to match any of

the images that were distributed with any of the images that

you found on the computer?

A    When the forensic preview was conducted of the laptop

on scene, I immediately noticed that one of the first images

that was returned was one of the images that were downloaded

on August 22nd.

Q    And is that the same image that's called "Baby J Fuck

Me"?

A    Yes, correct.

Q    And that image, what does it depict?

A    It's various images of an adult male having sexual
intercourse with a female child who is approximately four to
six years old.

Q    Now with regard to the statement that the defendant
made, did he say that he knew that these types of images
were of real children?

A    Yes.

Q    And how did he express that he saw those children on
the -- on the -- when he looked at those images?  Did he
believe that those were real children?

A    Yes.

Q    And did he also believe that they were sexually abused?

A    He acknowledged that that was, yes.

Q    Did he express any interest in preference for types of
children?

A    I believe he said his preference was for prepubescent
female children and he was not interested in images of male
children but that there may be some on there just, you know,
accidentally.

Q    And why did he have these images in his car?

A    He was trying to hide them from his wife.

Q    Did he receive any type of sexual gratification from
looking at these images?

A    He admitted to masturbating to the images.

Q    Now with regard to you were talking about the runway
and that there was a runway in his property.

A    Right.  It's a fly-in community.  Most people have
planes there.

Q    And how many planes does he have on his property?

A    In the hangar right on -- right next to his house he
had I believe five aircraft.

Q    And did he have any other vehicles on his property?

A    He had two cars, at least one of which I believe was a
Mercedes in his -- in the garage, he had a Chrysler
convertible that he was driving, and a Lincoln that his wife
drove.  Oh, and a large RV vehicle in his hangar as well.
Oh, he had a Rolls Royce also in the hangar too.

Q    When someone has an airplane in this fly-in community,
what are they supposed to do in order to leave the country?

A    In order to go foreign?  The Customs requirement anyway
is that they notify Customs and Border Patrol at least an
hour before they depart, that they notify them where they're
going and who they're traveling with or where they're
leaving from.

Q    Is it possible for someone to, within that fly-in
community, to leave the United States and go to a foreign
country without notifying CBP?

A    Sure.  I mean there's no physical restriction.  There's
a requirement that you notify, but there's -- there are no

controls at (inaudible) to make sure that one does.

Q    Now, the defendant here had notified CBP that he was leaving the country on Sunday; is that correct?

A    There was a notification submitted to CBP I want to say maybe a week before that he intended to fly out to the Bahamas on one of his aircraft on this past Saturday.  When I talked to him on scene he said he was actually planning to leave on Sunday, but at any rate the plane was there that he was supposed to go to the Bahamas.

Q    Did he update CBP with regard to whether he was leaving on Sunday?

A    Not that I'm aware of, but I'm not sure.

Q    And was he concerned about whether or not he would be able to leave on Sunday?

A    Yes.  When I was talking to him late Friday night when we were at his house, he expressed concern to me whether this could -- this -- I think the words he used were "this whole situation could be resolved before" or if it was going to conflict with their planned vacation.

Q    And you said you seized his passport.  How many different places has he traveled outside of the United States?

A    I believe it was a relatively new passport.  I don't have an exact count, but there were Bahama stamps in there, there were some stamps from other countries.  But I

1    specifically asked him about some other travel that he had

2    had.

3    Q    What other countries?

4    A    I asked him where he had been in the past.  He said

5    China, Philippines, Thailand, Malaysia.  There may be a

6    couple other Asian countries, and then he said as well as

7    many countries in Europe.  He said he was very well

8    traveled.  He was a world traveler, were his words.

9    Q    Besides the computers did you seize anything else?

10   A    The computers, computer-related objects, media, a book

11   and a passport.

12   Q    And the book.  What was the title of the book?

13   A    If I'm not mistaken it was *How to Hide Your Assets and*

14   *Disappear*.

15   Q    And what was -- did you -- were you able to look

16   through the book to find out what that book was about?

17   A    I didn't personally.  The person who identified the

18   book told me that he noticed that the -- there was a

19   bookmark in the book and it was a business card for Mr.

20   Jennings and it was on the page that said how to --

21   something like how to defeat the detectives, something along

22   those lines.

23   Q    Okay.  Did Mr. Jennings speak to you at all about any

24   of his assets?

25   A    He talked to me generally about his financial

1    condition. And he told me that he had the week before he

2    had been down working on one of his boats, and I think he

3    said it was 64-foot. He talked generally about how he had

4    been through a bankruptcy, how this past several years had

5    not been good, that he -- he I guess got a lot of his

6    financial support from his mother, and I think a lot of his

7    assets according to him were not really in his name.

8    Q    You said he had a 65-foot boat that he was working on.

9    Where is this boat located?

10   A    I think it was 64-foot. I think that's what he said.

11   I'd have to refer to the recording to be exact. But that's

12   the "Dragon Lady," I believe, and that was in Pompano Beach.

13            MS. MESA: I don't have anything further.

14            MR. LANGS: Nothing more for (inaudible).

15            THE COURT: All right. You're excused.

16            THE WITNESS: Thank you.

17            MR. LANGS: Your Honor, Mr. Jennings' wife is

18   present in the courtroom. I'd just like to call her to

19   address some of the issues that the agent brought up, if

20   that's permissible.

21            THE COURT: Okay.

22            MR. LANGS: I would call Joanne Jennings.

23                        **(WITNESS SWORN)**

24            THE WITNESS: I do.

25            THE DEPUTY CLERK: Please state your name for the

1   record.

2          THE WITNESS:  Joanne Jennings.

3                    **DIRECT EXAMINATION**

4   BY MR. LANGS:

5   Q    Good morning, Ms. Jennings.  Take a breath.  Are you

6   nervous?

7   A    You don't want me to take a big breath.  It won't be

8   good.

9   Q    Okay.  Try to take a little breath.

10  A    Okay.

11  Q    All right.  We'll go slow.  We just have to address

12  some issues.

13       One of the concerns the government has for your husband

14  is flight.

15  A    Uh-huh.

16  Q    So I want to talk about that.  Okay?

17  A    Okay.

18  Q    The gentleman here in the red, the defendant, is your

19  husband, correct?

20  A    That's correct.

21  Q    If you can just tell the Court a little bit about

22  yourself and how long you've known your husband, Mr.

23  Jennings?

24  A    Would it be -- could I get a little glass of water,

25  please.

```
 1   Q     Sure.  Go ahead.  Why don't you start and I'll get that
 2   for you.  How long have you known your husband?
 3   A     I've had a little problem for three months.  Sorry.
 4         Could you repeat the first question, please.
 5   Q     How long have you known your husband?
 6   A     I've known my husband since 2006.
 7   Q     And if you can, just kind of in summary fashion give
 8   us, give the Court a feel for how you met him, how long
 9   you've been married, and why you're living up in Volusia
10   County in your home.
11   A     I was living in Ocala, Central Florida, by myself.  And
12   I was taking pilot lessons and I used to fly out -- go out
13   to the airport every week for approximately -- probably four
14   times a week.
15   Q     Is that where you met Mr. Jennings, through this
16   flying?
17   A     Right.  I went there on a Saturday one day, which I
18   don't normally do because it's so busy, and he -- him and
19   his friend flew in and I saw them at the little restaurant
20   and I was alone.  And then I went out to my little plane to,
21   you know, get it ready, and he came out and he said, hi, you
22   know, I think I need lessons.  And I said, no you don't, you
23   don't need lessons.  Anyways, that's sort of how we met and
24   he gave me his card and --
25   Q     That was about 10 years ago?
```

A     2006.

Q     All right.  And then when did you get married?

A     We got married in 2009.

Q     And when did you move to this Volusia County home?

A     Well, actually I moved there -- we were living together like two-and-a-half years before we got married.

Q     And when did you move into the home here in Volusia County?

A     Well two-and-a-half -- well, two thousand and -- probably in the summer of 2006.

Q     Okay.  And it's just you and your husband, right?

A     Yes.

Q     You don't have any kids there living in the house, do you?

A     No.  We've just got two cats and a dog.

Q     Okay.  And you've heard some of the things that the agent talked about.  If you can, clarify those matters.  What are -- is your financial situation at the home?

A     At the home as far as I'm aware of?

Q     With these planes, with the boats, with the house.

A     These boats and all the planes are not -- they're not in his name.  They're in a trust.  So he was trying to fix them all up.  Of course the boats were all in big disaster.  The house is -- what do you call it?  When you go into bankruptcy and then they put a thing on the house?

Q    A lien on the house?

A    I don't really know what you call it.  It's not like we can go and sell it or can't go get any money off of it.

Q    This bankruptcy proceeding you were talking about, is it still ongoing?

A    Yes.  And I believe that he has a judgment for $28 million or something like that.

Q    Is Mr. Jennings working right now?

A    No.  Well, I mean he's fiddling on the boat.  I mean that's a lot of work.

Q    He doesn't have a stable form of income?

A    No.  No.

Q    He doesn't have a stable form of employment?

A    No.  He gets a pension check every month.

Q    How much is that pension check?

A    Seventeen hundred.

Q    That comes from his prior employer obviously?

A    No.  It comes from the government.  It's Social Security or something.

Q    All right.  So he's receiving Social Security benefits.

A    Right.

Q    On a monthly basis.

A    Uh-huh.

Q    This trust.  Are you familiar enough with this trust to tell us who it belongs to, who it's operated by?

A    I'm not really familiar with it because it's like a
stock this high.

Q    Do you know whether Mr. Jennings has authority to
invade the trust?  Can he go into it and take money out of
it?

A    Well his ex-wife, Janice, is the trustee.

Q    These planes that we talked about, are they owned by
the trust or are they owned by Mr. Jennings?

A    Yes, they're owned by the trust.

Q    All right.  So Mr. -- your husband, he wouldn't have
any authority to sell the planes?

A    Well we're trying to sell them, like, but the money
would not go to us.  It has to go back into the trust.

Q    Because you owe the trust money because of the
bankruptcy?

A    I don't really understand what the -- I can't really
continue with that because I'm really not sure.

Q    Would you agree with me then your financial situation
is convoluted at best?

A    It's more than convoluted.

Q    Do you have assets other than the home?

A    No.

Q    Do you have assets that you can put up as collateral?
Do you have assets that you can sell and to help post bond?

A    I have, you know, five or 10,000, $15,000.

Q    You yourself?

A    In the bank account.

Q    If the Court were to release your husband --

A    Yes.

Q    -- is he free to come home with you to live in the Volusia County home?

A    Yes.

Q    Do you have a landline in the house?  Do you have a regular telephone line?

A    Yes.

Q    Are there schools nearby near your community?

A    There's one like outside of our community.

Q    And approximately, if you can guess, how far is it?  A mile?  Three-quarters of a mile?  Two miles down the road?

A    Probably two.

Q    All right.  Any other daycare facilities in the area?

A    No.

Q    Anywhere where kids normally congregate?

A    I don't see any.  It's kind of a -- more of an adult community.

Q    How many -- do you know how many homes are in the community?

A    About 1,200.

Q    And do they all share one runway for these planes?

A    There's only one runway.

Q    And the planes we're talking about, I just envision single propeller planes, you know.  I don't -- what kind of planes --

A    Most of them are single, single engine planes.

Q    And the five planes we talked about in your case, what are they?

A    There's a Columbia 350, which is a single engine plane, four seater; there's a four seater 172, which, you know, what I'm more comfortable in, single engine; there's a 320, which is a very, very tiny plane.  I wouldn't even say a grownup person would sit in it it's so tight.  There's a Zlin, which is Czechoslovakian aerobatic trainer plane that seats two and it's got a canopy on it.  And there is a Citation jet, which is a twin engine.

Q    Can you confirm to us that as far as you know Mr. Jennings is a U.S. citizen?

A    Yes, he is.

Q    Can you confirm to us that Mr. Jennings has in the past traveled outside the United States, for example, the Bahamas, Italy, and Latvia?

A    Well, since I've known him we've been to the Bahamas and we went to -- we went to Rome once.  And we've been around to the United States, you know, California.

Q    Can you confirm that Mr. Jennings is in good health?

A    I would say he's, you know, getting healthier.

Q    And flesh that out a little bit, getting healthier?

A    Well because last year he had, you know, more overweight issues and, you know, his blood sugar was kind of off and we've been trying to get him to eat better and exercise.

Q    Can you confirm that while you've known Mr. Jennings he has not been in trouble with the law?

A    He has not.

Q    Can you flesh out for us a little bit of his ties to the community, to Volusia County, Orange County, to this greater central area.  Does he have friends here?  Does he have family in the area?

A    Well, we have friends.  And his mother lives around the corner in our community.

Q    And how's his relationship with mom?

A    Well, mom's difficult.  You know, through his whole life it's been, you know, a different family than what I've come through.

Q    And I've forgotten already, how long have you lived at the house?

A    Since 2006.  Six years.

Q    Is the house in his name alone or in your name also?

A    It's his name.

Q    His name alone.

A    Uh-huh.

1    Q    Do you yourself have a passport?

2    A    I do.

3    Q    Would you be willing to act as what's called a

4 third-party custodian for the Court if he releases Mr.

5 Jennings?  Meaning this:  Would you be willing to be the

6 eyes and ears for the Court to make sure that Mr. Jennings

7 does what he's supposed to do if released?

8    A    Yes.  Certainly.

9    Q    This is hard to ask of a wife.  Would you be willing to

10 report your husband if for some reason he violates a curfew

11 or doesn't make it to a court appearance.

12    A    Yes.

13    Q    Okay.  Would you be willing to co-sign a bond, meaning

14 would you be willing to put your finances at risk if Mr.

15 Jennings doesn't abide by the Court's rules?

16    A    Yes.

17    Q    This is the -- the agent indicated this was a surprise.

18 This case was a surprise to you.  Is it true to say it that

19 way?

20    A    Total shock.

21    Q    Are there any other computers in the home right now as

22 we sit here in the courtroom today?

23    A    I went out yesterday and bought one because I needed

24 one for my business and all of my banking.  But I can move

25 my computer out of the house.

Q    Would you be willing just to have the one and only computer in the house?

A    Oh yes.

Q    Would you be willing to separate or get rid of any other computers or any other forms or access to the Internet while in the house?

A    Well certainly, but there isn't anything right now except the one computer.

Q    Would you be willing to have that computer that you use for your employment, get that password encoded so that Mr. Jennings couldn't get access to it?

A    Yes.  Yes.

        MR. LANGS:  I don't think I have anything else, Your Honor.

        THE COURT:  All right.  Ms. Mesa, cross?

        MS. MESA:  Yes.

                            **CROSS-EXAMINATION**

BY MS. MESA:

Q    Your husband's a pilot?

A    Yes.  I am too.

Q    And so does he fly those planes at all, the ones that are on your property?

A    Well we haven't flown very many of them.  We've flown the 172 once in a while, like every two months, maybe take it up.  Last time we went up to St. Augustine, had lunch,

came back.  And he was flying the Columbia back and forth a

bit to the boats, but that just got too expensive.

Q    And sometimes your husband travels alone?

A    To the boat?

Q    To the boat.

A    Yes.

Q    And does he sometimes travel out of the United States

alone?

A    Alone?  No.

Q    And you said that your husband was a United States

citizen.  Are you a United States citizen?

A    I'm a permanent resident.

Q    And what country are you from?

A    Canada.

Q    So your passport is --

A    Canadian.

Q    -- a Canadian passport; is that right?

A    Yes.

Q    With regard to you said your business.

A    Yes.

Q    Is your business Joe Jen?

A    That's correct?

Q    And that is a firearms business?

A    That's correct.

Q    And you have a firearms license?

A    Well, I've got a permit from the HEF to sell firearms.
I don't possess a firearm.

Q    And how did you get into this business?  Were you
originally involved in it?

A    Well, it was just like I was farmed in because we
needed the money and it was like sort of like his family had
always done it.  That's how I got into it.

Q    So when you say you were farmed in, his family --

A    I mean -- I mean I didn't have much knowledge of the
business.  But really, once you set up phones and you start
making calls, that's basically a sales office.

Q    So his family got you involved in the firearm business;
is that correct?

A    I don't know if they got me involved, but it was an
easier business to get into since they had some knowledge of
the practice of it.

Q    And in fact your husband is a Jennings Firearm company.
Didn't he have that company?

A    He used to have the company.

Q    He used to have that company.  He could no longer have
that company because he had a domestic violence conviction a
long time ago?

A    Thirty years ago.  Thirty years ago.

Q    Right.  A long time ago.

A    Yes.

Q    But the Lautenberg Amendment will not allow him to have
a business that's involving firearms?

A    He has been through numerous court proceedings where
they have granted him access, and then three years, four
years, eight years later they come back and take it away
again, then they gave it back to him.  That's as much as I
know.  But I mean it's all on the Internet to read about it.

Q    So as part of your firearm business --

A    Yes.

Q    -- that's not something that you're necessarily
familiar with as much as the family is familiar; is that
correct?

A    Well I'm more familiar now obviously from practice.

Q    Now with regard to this trust account.

A    Right.

Q    You said that his ex-wife is the trustee of the
account; is that right?

A    That's correct.

Q    And in that account she pays him periodically money
from that account?

A    Not really.  There's no income.  There's no -- we're
not getting any salaries.  He's not getting a salary for
working on the boats or the airplanes.

Q    So with regard to selling some of the assets, that is
the planes or the boats so that they could go into the

1   trustee [sic], would that help to allow money to come out of

2   that trust?

3   A   Well, I'm not really sure about that part because we

4   haven't sold anything yet. I don't have any basis to go on.

5   Q   But is that the intent of selling any of those

6   properties?

7   A   I would assume that would be the intent.

8   Q   And you already stated that he receives $1,700 a --

9   A   Correct.

10   Q   Is it a month or a week?

11   A   It's a month. And it might be 1,762. I have some

12   papers over there.

13   Q   And then this $15,000 that's in the bank account, is

14   that in your name only?

15   A   I have maybe 5,000 in our joint account and maybe 6,000

16   in my personal account. And then I have another account

17   where I have like 7,000 in a savings account, 3,000 in a

18   regular account, and maybe another $1,600. I have papers

19   for that.

20   Q   Okay. And some of the monies is between you and your

21   husband and some of the monies are just yours?

22   A   Most of our joint, our joint account only has $4,000.

23   Q   Now you've already stated that you were surprised about

24   him being involved in these offenses. Is that right?

25   A   Mostly, yes.

1  Q    Now what do you mean by mostly?

2  A    No, I mean like I'm all like -- I can't describe how

3  shocked I am.  I've had no ideas.  And I consider myself a

4  fairly good judge of character and, you know, reading

5  people.

6  Q    So he was able to successfully hide --

7  A    I didn't know anything.

8  Q    -- this proclivity that he has?

9  A    That's correct.

10          MS. MESA:  I don't have anything further.

11          MR. LANGS:  Nothing else, Your Honor.

12          THE COURT:  All right.  Ma'am, you're excused.

13          MR. LANGS:  I'm just going to proffer and rely on

14  the pretrial services report and just make a brief argument,

15  if I may.

16          THE COURT:  All right.

17          MR. LANGS:  I would frame the issue that we have

18  before Your Honor as one of two things:  We have the

19  statutory presumption, and then I think probably the

20  elephant in the room is flight, or risk of flight in this

21  instance.

22      I don't take much stock into this notion of dangerous

23  to the community.  I don't think we have any evidence to

24  suggest that Mr. Jennings poses any danger other than the

25  nature of the charge in this instance.  But it seems to me

that the idea that he is a doer or that he is a molester or that he's got access to that opportunity I think is fairly well been shut down.

So my point of view is that we have the presumption and then we have this notion of risk of flight. And I would suggest, Your Honor, that when we go through the 3142(g) factors that we can establish conditions of release. As a matter of fact, I might posit anticipating what the government is probably going to have to say about this is that of any place to stay this is probably an ideal place outside of a jail cell. And as I always like to say, the Bail Reform Act is there to not necessarily guarantee appearance in court but to make reasonable assurance that --

THE COURT: How is this ideal if risk of flight is the focus?

MR. LANGS: Well that --

THE COURT: I mean you're saying danger to the community is something that you're dismissive of, but you're dealing with risk of flight. And you're suggesting that this is the ideal location with the twin engine jet, an airport, you know, the ability to just leave the country by -- I mean he's qualified to pilot that particular jet, is my assumption, although it wasn't directly addressed. And so why is that ideal?

MR. LANGS: Because it's out in the middle --

middle of essentially nowhere.  It's a gated community, it's

away from schools, it's away from kids, and I think

everyone --

     THE COURT:  That's danger to the community.  You

said danger to the community was something that you were

fairly dismissive of.  You weren't buying into that so your

focus was risk of flight.

     MR. LANGS:  Oh, in this --

     THE COURT:  And then you transitioned to this is

the ideal place for him.

     MR. LANGS:  I'm sorry.  Yeah.  In terms of danger

to the community I don't think there's one -- there's an

articulable basis to point to that he is a danger, other

than the charge itself.

But in terms of risk of flight, I think that 3142(c)

addresses that whole notion, not to take this as a pun, but

we can effectively ground Mr. Jennings under all of the

conditions that essentially Congress mandates that we impose

on this particular case.

     THE COURT:  How do we do that?

     MR. LANGS:  Well --

     THE COURT:  How do I do that?

     MR. LANGS:  You can set --

     THE COURT:  Talk to me about that.

     MR. LANGS:  Right.  You can set terms and

conditions that would include obviously his appearance to

court but that -- the standard terms of conditions, but more

particularly that he try to seek or actively maintain

employment.  We can try to maintain educational performance

at this point.  He is 63, going to be 64.  He certainly can

abide by specified restrictions or express restrictions on

personal associations, places of boater travel, you can --

you can highly curtail his mode of transportation, where he

can go, when he can go.  Obviously avoid all contact with

minors.  He has to report on a regular basis to a particular

or a designated law enforcement agency.

          THE COURT:  Right, right.

          MR. LANGS:  It doesn't necessarily have to be

pretrial.  He can certainly check in with the Volusia County

Sheriff's Office once a week if the Court has conditions of

-- or concerns there.

    Ground him in terms of his passport, ground him in

terms of his access to these planes.  They're not his.

Apparently they belong to a trust.

          THE COURT:  How do I ground him in terms of his

access to these planes?  How do I keep him grounded?

          MR. LANGS:  Well you order him, he can't have

access to these planes.  He can't work on planes, he can't

work on boats.

          THE COURT:  That's it?  Just enter an order?

MR. LANGS:  That's a court order.  You take away
his keys.  We have a third-party custodian, his wife, is
willing to act as the eyes and ears of the Court.  We can
have heightened pretrial supervision, we can have him check
in once a day or at least report maybe even to the state
facility up here, the state or county probation if
necessary.  He has to wear an ankle bracelet if the statute
mandates that he's under electronic monitoring, you can
impose curfews.  So in terms of --

THE COURT:  What about his pilot's license and his
ability to just simply call up the tower there and say I'm
leaving now.

MR. LANGS:  You have him direct that he surrenders
his --

THE COURT:  Other than it's a violation of a
federal court order, which if he does that he's going to
suffer the consequences of that.  But I just -- in terms of
how do I mitigate that.

MR. LANGS:  Well, you direct that he surrenders
his pilot's license, you ask for a suspension, you notify
FAA, you place him on a no-fly list.  You know, we can go to
great lengths to assure that the terms and conditions are in
place.  But the overall question is anyone who is released
on bond has any means to get away, no matter what the Court
says.

THE COURT:  Well, I know.  But I'm talking -- I mean my whole discussion with you here today is really focused on his ability to take flight.  Literally.  That's -- that's what I'm focused on.  And, you know, I understand that this is an individual who's, for all intents and purposes this is his first offense.  I mean he has a domestic from a long time ago that's, you know.  He doesn't have any failures to appear or anything like that.  But I mean his risk of flight is a lot different than the risk that we see in the ordinary case.

MR. LANGS:  Trying to be, in all candor, if his ability to fly is of such a degree and concern for the Court, I have no way other than to take his arms and legs away to prevent him from getting on a plane and actually flying the plane.  We can issue any number of conditions because he has the ability to fly.  There would be nothing to stop him from actually getting on a plane, you know, if he walked home and jumped on a plane and took off without telling anyone.

THE COURT:  That's the ordinary situation.

MR. LANGS:  Pardon?

THE COURT:  That -- well you're talking about him jumping on a plane at his house?  Is that what you're talking about?

MR. LANGS:  That's my thinking.

1           THE COURT:  Okay.

2           MR. LANGS:  I mean he has -- he has the ability to

3    fly.  He knows how to fly.  But I think that in this

4    instance because the Court indicated, you know, lack of

5    criminal history, first involvement with the law, you know,

6    I think he's got relatively sound ties to Volusia County.

7    It's -- I think that Congress in terms of the statutory

8    construct has enough there to say we can, if the Court is so

9    inclined, if your fear of his risk of flight isn't as great,

10   you know, to keep in a jail cell, that we can set conditions

11   to release him, to include all those matters of home

12   detention, curfew, electronic monitoring, things of that

13   nature.

14          But I can't -- I can't take away his ability to fly.

15   Yeah, he knows how to fly a plane.  And other than taking

16   those planes off the property or not giving him access to

17   those planes, you know, it's -- yeah, you know, if he wanted

18   to get on a plane he could fly it.

19          And other than his word and maybe, you know, the offer

20   of policing by his wife or others, pretrial services, and

21   maybe the local sheriff's office just to keep that

22   heightened reporting provision in place, you could put GPS

23   on him I guess at this point if we have the mechanics

24   available right now.  We would know where he is 24/7.

25          So what I'm suggesting, Your Honor, is that under these

1    circumstances and what Mr. Jennings presents, we could

2    fashion terms and conditions for his appearance here in

3    court and to protect the community at large.  But I

4    recognize and acknowledge the one driving factor here is

5    that he's got the ability to fly a plane.  He knows how to

6    do that.

7        So if he really, really wanted to get away, you know, I

8    wouldn't be able to respond to that but other than to say

9    legally could we do it?  I think we could.  I think we could

10   do it successfully and I think his wife is here in a

11   position where she could help the Court.  And with the

12   heightened supervision, the GPS, the (inaudible) monitoring,

13   I think we'd be in a position where we could take care of

14   the case.

15       The remaining factors obviously, Your Honor, I would

16   suggest, the aggravators Ms. Mesa will certainly put out,

17   but on the mitigation side but for the one issue the Court

18   has raised I would suggest that we're in a good position

19   where we could ask for bond, whether it be with surety or

20   without.  I would ask for an unsecured signature bond, have

21   his wife co-sign that, act as a third-party custodian with

22   all the terms and conditions that are called for by 3142(c).

23            THE COURT:  All right.  Ms. Mesa?

24            MS. MESA:  Your Honor, I'm going to call ATF Agent

25   McCann to the stand.

1      THE COURT:  Okay.

2                    **(WITNESS SWORN)**

3      THE WITNESS:  I do.

4      THE DEPUTY CLERK:  Please be seated and state your

5 name for the record.

6      THE WITNESS:  Kevin McCann.

7                  **DIRECT EXAMINATION**

8 BY MS. MESA:

9 Q    Special Agent McCann, could you tell us what agency you

10 work with?

11 A    I work for the Bureau of Alcohol, Tobacco, Firearms and

12 Explosives.

13 Q    And how long have you been with them?

14 A    Twenty years.

15 Q    And in your position as a special agent, what types of

16 cases do you investigate?

17 A    I investigate alleged violations of the federal

18 firearms, alcohol, arson, tobacco and explosive laws.

19 Q    Now, independent of this particular case with the ICE

20 agents, did you happen to come across information regarding

21 this defendant?

22 A    Yes.

23 Q    And I'm going to steer you specifically at this moment

24 in time to what information you received about him that has

25 nothing to do with firearms, alcohol and tobacco.  What

1  information did you receive?

2  A    I'm sorry.  What information have I received unrelated

3  to any ATF-related information?

4  Q    Well, I take it back.  Let me start again.

5      Did you have an investigation with regard to this

6  particular defendant?

7  A    Yes.

8  Q    And what did that investigation entail?

9  A    I received some information from an ATF industry

10  operations investigator that Mr. Jennings allegedly is in

11  the business of selling firearms, but he's in that business

12  under his wife's license, and that agent asked me if I can

13  look into that matter.

14  Q    And did you do that?

15  A    I did.

16  Q    And when, what's the time frame that you started

17  looking into it?

18  A    April of 2012.

19  Q    So in that -- as part of that investigation what did

20  you find?

21  A    I preliminary looked -- preliminary I looked into the

22  allegations, I conducted several interviews, and I made some

23  determinations.  However, that investigation is still

24  ongoing.

25  Q    Okay.  With regard to child pornography, did you happen

1   to come across any information with regard to child

2   pornography and the defendant?

3   A    Yes.

4   Q    And what was that information?

5   A    During two separate interviews of witnesses, those

6   witnesses provided information to me that Mr. Jennings in

7   the past had possessed child pornography.

8   Q    And how did these witnesses know that he possessed

9   child pornography?

10  A    I was advised by the witnesses --

11          MR. LANGS:  Your Honor, just to make the record, I

12  better object.  We're -- I know hearsay's allowed here, but

13  I think it sounds to me like we're getting second, third,

14  fourth generation hearsay, and there is a reliability

15  standard that we have to meet under these circumstances.  So

16  unless he's willing to flesh out --

17          THE COURT:  You can address that on cross.  Your

18  objection's overruled.

19  BY MS. MESA:

20  Q    Go ahead.  Do you want me to restate the question?

21  A    Please.

22  Q    Okay.  What were these witnesses -- what did these

23  witnesses tell you with regard to child pornography and the

24  defendant?

25  A    One of the witnesses actually observed it on Mr.

1   Jennings' computer.

2   Q    And how was that?

3   A    It was about 2004, 2005, Mr. Jennings had some viruses

4   on his laptop computer.  He asked one of the witnesses to

5   see if he could remove the viruses, and that witness was

6   unsuccessful at doing it so he hired an expert to do that.

7   That expert uncovered child pornography while he was trying

8   to remove the viruses.

9   Q    And did he report those, the images?

10  A    He reported it to the witness but not to the police.

11  Q    And you have another witness?

12  A    That's correct.

13  Q    And did that witness observe child pornography on that

14  same computer?

15  A    No.  That witness was just advised that from the

16  primary witness.

17  Q    And what did he do with regard to the child pornography

18  images?

19  A    The computer expert erased the hard drive and gave the

20  computer back.

21  Q    Do you have any other information with regard to the

22  defendant and the child pornography?

23  A    The witness observed the images on the computer when

24  the expert uncovered them.  And after the hard drive was

25  deleted, that witness confronted Mr. Jennings about the

1  images and had a discussion with Mr. Jennings.

2  Q    And did Mr. Jennings make a statement with regard to

3  that discussion?

4  A    Mr. Jennings stated that he had loads of child

5  pornography and that he had all of it backed up anyway.

6  Q    How about traveling for child pornography or anything

7  involving children?

8  A    According to this witness, Mr. Jennings had traveled to

9  Thailand and Vietnam to have sex with children.

10 Q    With regard to the witness, do you find that that

11 witness was a reliable witness?

12 A    I do.

13 Q    And why do you believe that?

14 A    I spent a couple hours with that witness.  And during

15 that interview the witness made some statements that

16 actually implicated himself too.  I believe based on all the

17 information I know and all the information he provided me,

18 including what was uncovered during the search warrant, it

19 corroborates the information.

20          MS. MESA:  I don't have anything further.

21          THE COURT:  Mr. Langs?

22          MR. LANGS:  Well, I better request *Jencks*

23 material, Your Honor, before I conduct any

24 cross-examination.

25          THE COURT:  Do we have it here?

1          MS. MESA:  Exactly what it is that the defense

2     wants?

3          MR. LANGS:  The written reports or statements,

4     written statements by the witnesses that he's relying on.

5     We're entitled to them, otherwise we'll have to ask for a

6     continuance or ask the Court to strike his testimony and not

7     consider it.

8          MS. MESA:  Well we'll get that information, Your

9     Honor.

10          THE COURT:  You don't have it?

11          MS. MESA:  I -- I'm -- I'll talk to the agent and

12     see if he has it.  I just talked to the agent with regard to

13     it.

14          THE COURT:  Okay.  Well it's a simple question.

15     Do you have the materials with you here today, Agent McCann?

16          THE WITNESS:  I do.

17          THE COURT:  You do?  Okay.

18          MS. MESA:  All right.

19          THE COURT:  Very well.  Let's go ahead and produce

20     it.  You're excused from the stand momentarily to go ahead

21     and recover the materials and produce it to Mr. Langs, and

22     then we'll continue.

23          MR. LANGS:  If I may, Your Honor, may I ask for a

24     short recess in which to look at the material, because I

25     don't know what's coming my way.

1           THE COURT:  How long?

2           MR. LANGS:  Probably half an hour.  Just give me a

3      chance to look at it and review it and talk to Mr. Jennings

4      about it.

5           THE COURT:  All right.  Just give me a moment.

6      Okay?

7         All right.  Mr. Langs, you've already picked up your

8      sandwich, is my understanding.

9           MR. LANGS:  I did.

10          THE COURT:  That's what I heard at least.  So I'm

11     going to give you an hour recess.  That'll give you time to

12     eat as well.  And we'll resume here at -- it's 12:30, or

13     approximately.  We'll resume at 1:30.  Okay?

14          MR. LANGS:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.  We're

16     adjourned.

17                    (Recess taken at 12:30 p.m.)

18                   (Proceedings resume at 1:30 p.m.)

19          THE COURT:  All right.  Have the Jenks materials

20     been produced?

21          MS. MESA:  Yes, Your Honor.

22          MR. LANGS:  They have, Your Honor.  They've been

23     redacted.  I've had a chance to go over and just one or two

24     questions for the agent.

25          MS. MESA:  But --

1          THE COURT:  Okay.  If we could, just for the

2    record, can you tell me what was provided just so we have

3    some record of what was produced?

4          MS. MESA:  Sure.  There was a Report of

5    Investigation from Special Agent McMann, and in that Report

6    of Investigation he advises that someone told him around --

7    that Jennings was involved in having child pornography on

8    his computer and occasionally traveled to Thailand, and in

9    quotations "to play with underage" --

10         THE COURT:  All right.  If you could just, I mean,

11   give me by date, you know, what documents have been

12   provided.  You don't have to -- you don't have to summarize

13   the contents of the records.

14         MS. MESA:  Sure.

15         THE COURT:  Just so we have some account of what's

16   been produced.

17         MS. MESA:  Okay.  The Report of Investigations

18   there are three reports and they were all dated September 4,

19   2012, and they are from Special Agent Kevin McCann.

20         THE COURT:  All right.  Thank you.

21         MS. MESA:  There is one housekeeping matter, Your

22   Honor.

23         THE COURT:  All right.

24         MS. MESA:  During the break, Mrs. Jennings needed

25   a ride of some sort, needed to get to a telephone.  So

Special Agent Grey offered to make that phone call. And during that moment in time that they were encountering one another, Mrs. Jennings stated that she had to pull $200,000 out of this trust account in order to pay someone, specifically one of his partners.

My concern is -- and at that point, once she made that statement Special Agent Grey said not to say anything and just made the phone call for her and then that was the end of that. What my concern is is that she was testifying with regard to what was in that -- whether or not they had access to the trust account or whether there was anything in that trust account. And that would be an issue with regard to having a significant amount of assets for the flight risk issue that the government is raising.

MR. LANGS: That, if I may respond, Your Honor.

THE COURT: Please.

MR. LANGS: That issue, that response is going to open up a whole can of worms because that statement from my understanding is connected to what Agent McCann had testified here. I'm not going to give away names. I'll call it witness number one.

Witness number one apparently is a business acquaintance or partner or associate in some manner with Mr. Jennings. There were bad issues between them. Witness number one was claiming Mr. Jennings owed him money. This

was a while ago. Apparently these -- money was being put back and forth. So in terms of the context of $200,000 that was corporate money. That wasn't her own money. I don't know where she got that from. That had to do with witness number one and his accusations against this company that said, hey, you guys owed us money or -- I don't know all the ins and outs.

I don't think it's relevant for purposes of these proceedings. I would certainly suggest that Mrs. Jennings testify appropriately and candidly to her personal sources, aside from any business finances in terms of that, so.

THE COURT: All right. Well, you know, we're going to reserve the argument for later. You can go ahead and let's wrap up the testimony and then proceed to argument.

MR. LANGS: And my only question's, Your Honor, of Agent McCann.

**CROSS-EXAMINATION**

BY MR. LANGS:

Q    In terms of your direct testimony from this morning, with who I'll call witness number one, those accusations that you received from those parties, those witnesses, as you sit here those accusations have not been confirmed or corroborated, correct?

A    That's incorrect.

1  Q    Have you been able to confirm and corroborate when Mr.
2  Jennings, if ever, went to Thailand?
3  A    No, but I was able to confirm that Mr. Jennings
4  possessed child pornography.
5  Q    But did Mr. Jennings ever go to Thailand?  Were you
6  able to confirm that?
7  A    No, not personally.
8  Q    Were you ever able to confirm that Mr. Jennings
9  possessed child pornography in 2004?
10 A    No.
11 Q    Were you able to confirm or corroborate that he ever
12 possessed child pornography in 2005?
13 A    No.
14 Q    Were you able to confirm or corroborate that he had a
15 computer or possessed a computer that had child pornography
16 between 2004 and 2008?
17 A    No, just -- just currently.
18 Q    All right.  So the information that you testified to
19 was given to you by witness number one, right?
20 A    That's correct.
21      MR. LANGS:  Okay.  Thank you, Your Honor.  I have
22 nothing else.
23      THE COURT:  All right.  Anything further?
24      MS. MESA:  No, Your Honor.  Thank you.
25      THE COURT:  All right.  You're excused.

1          Any additional witnesses from the government?

2               MS. MESA:  No, Your Honor.

3               THE COURT:  Okay.  Mr. Langs has already presented

4     some argument, so I'll hear from you in terms of response

5     and then we'll give Mr. Langs the opportunity for a reply.

6     Okay?

7               MS. MESA:  Yes.

8               THE COURT:  Ms. Mesa?

9               MS. MESA:  Certainly the -- with regard to the

10    factors to consider are the nature and circumstances of the

11    offense.  In this particular case the presumption applies

12    that the defendant is a danger to the community because of

13    the distribution charges.

14          As Special Agent has already -- Special Agent Grey has

15    already testified to one of the images that he downloaded

16    from the defendant's computer was also found actually on the

17    defendant's computer with regard to the forensic preview.

18    And that was the one that began with the words "Baby" as one

19    of the images or movies.

20          So with regard to the nature and circumstances of the

21    offense and the weight of evidence against the defendant,

22    certainly the government has presented enough evidence with

23    regard to whether or not the defendant distributed and

24    possessed child pornography.

25          There is a concern for the government that the

defendant not only admits to distributing child pornography but also expressed an interest in prepubescent girls, masturbating to the images, even though he was aware that these are real children who have been sexually abused. He did this.

There's evidence out there that the defendant after -- since 2005 had been involved or engaged in possessing these child pornography images and was a bit cavalier with regard to whether or not he cared if these images were erased from his computer since he always had backups.

The other thing is is that he was living with his wife since 2006, and at no time does she know that he's engaged in this, in this particular criminal activity.

With regard to whether or not he's a danger to the community, aside from the presumption, aside from all of his admissions, there is also his admissions that were given to Special Agent McCann that he traveled to Thailand and Vietnam for sex with children.

So that becomes a problem for determining whether or not the community is safe as a result of how the defendant views his role in his criminal offense, but more importantly -- well I'm not going to say "more importantly." I take that back.

Equally important is that he's a flight risk. And the reason that he's a flight risk is because he has the ability

to leave the United States when he wants to leave the United States.  He has a taxi that goes to a runway, he has five different planes that he can use to get on this runway. There's absolutely no barrier for him to leave the United States if he wanted to leave the United States.

And on top of that, his wife has already said that not only is she a pilot but he's also a pilot.  She has Canadian citizenship.  So if he wanted to flee to Canada he could flee, presumably, and seek some sort of immigration haven for himself based on his wife's citizenship.

With regard to not having a barrier to leave the country, there is no tower, there's nobody there on that particular property to monitor whether he leaves or returns. By FAA rules he's supposed to report to CBP his flight plan. And in this particular instance he reported a flight plan for Saturday; however, he stated to Agent Grey that he was going to leave on Sunday.  So we don't know when he will leave.

He also has significant assets.  He has a $950,000 house.  He has six vehicles on the property.  He has five planes on the property.  One of those vehicles is an RV. And all of these assets, and as the wife has testified, are assets that they're trying to sell to put in the trust so that they could funnel money back to him.  And at this point they haven't been able to do it, but it's still a

1  possibility that it can happen.

2  So with regard to the defendant, not only is he a

3  danger to the community but he's also a flight risk.  With

4  those two things that are occurring in his particular case,

5  he becomes particularly a person who conditions -- other

6  conditions of release will not work.

7  So the United States asks that you detain him pending

8  these charges.

9  THE COURT:  What do you make of the fact that

10  apparently Special Agent McCann tried to investigate the

11  international travel, specifically for purposes of engaging

12  in victimization of minors and was not able to come up with

13  any evidence of travel to Vietnam, Thailand, Philippines or

14  any of those type of locations?

15  MS. MESA:  Your Honor, I don't think that Special

16  Agent McCann did an investigation with regard to where -- he

17  said that it was not corroborated but he didn't do an

18  investigation with regard to that.  Certainly --

19  THE COURT:  All right.  That's not what I got.

20  The agent's right here.

21  MS. MESA:  Okay.

22  THE COURT:  Get back up to the stand here and

23  let's talk about this.

24  You're still under oath, sir.  Do you understand?

25  THE WITNESS:  Yes.

1  **REDIRECT EXAMINATION**

2  BY MS. MESA:

3  Q    Did you investigate whether or not Mr. Jennings made

4  any travels outside of the United States?

5  A    No, I didn't investigate it.  And when I testified I

6  didn't corroborate it is I didn't even attempt to.

7  Q    Okay.  At some point did you tell anybody with regard

8  to what you knew about this case --

9  A    Yes.

10  Q    -- to another agency?

11  A    Yes.  I referred the information about the child

12  pornography and the international travel to have sex with

13  children to Homeland Security investigations.

14  Q    And when did you do that?

15  A    May of 2012.

16          THE COURT:  All right.  Mr. Langs, any questions?

17          MR. LANGS:  I just want to make sure I understand

18  the chronology.

19  **RECROSS-EXAMINATION**

20  BY MS. MESA:

21  Q    So ATF was conducting a separate and distinct

22  independent investigation into Mr. Jennings gun-related

23  matters, right?

24  A    That's correct.

25  Q    And as a part of that investigation, one of the

witnesses that you were using made allegations against Mr. Jennings that included child pornography matters, correct?

A    Yes, two witnesses did.

Q    And then based on those allegations you simply referred those child pornography matters to Homeland Security, correct?

A    That's correct.

Q    And you did not do anything to confirm, investigate, corroborate the witnesses' allegations against Mr. Jennings, correct?

A    Not for the child pornography issues.

Q    Okay.  So what you testified today, what you told us is what other people said?

A    That's correct.

         MR. LANGS:  Okay.  Thank you, Your Honor.

         THE COURT:  All right.  Anything further, Ms. Mesa?

         MS. MESA:  No, Your Honor.

         THE COURT:  All right.  You're excused again. Thank you.

    All right.  So it was not investigated.  All right.

    Mr. Langs, reply?

         MR. LANGS:  I think you have a solid record before Your Honor.

         THE COURT:  Okay.

1        MR. LANGS:  Nothing else to add.  Thank you.

2        THE COURT:  Okay.  Your client did travel to those

3   locations?

4        MR. LANGS:  No, sir.  My understanding, according

5   to the pretrial services report, is that he has traveled to

6   the Bahamas, he has traveled to Latvia, and he has gone to

7   Italy.

8        THE COURT:  Okay.  So your proffer is that he --

9   he has not traveled to Thailand or Vietnam?

10       MR. LANGS:  At this point I don't have any

11  information to confirm or deny that.  I don't have anything

12  other than --

13       THE COURT:  So you have no information one way or

14  the other.

15       MR. LANGS:  No, other than relying on the pretrial

16  services reports.

17       THE COURT:  You wouldn't be able to offer anything

18  to rebut that.

19       MR. LANGS:  No, sir.

20       THE COURT:  Okay.  All right.

21       MS. MESA:  Your Honor?

22       THE COURT:  Yes?

23       MS. MESA:  If I may, I believe that Special Agent

24  Grey testified that it was Mr. Jennings told him that he

25  traveled to Vietnam and Thailand.

1           THE COURT:  Okay.  All right.  Mr. Jennings, as

2      we've been discussing the issue for my determination at this

3      point is whether or not I believe I can set conditions which

4      will reasonably assure your future appearance in regard to

5      further proceedings and also the safety of the community.

6           In making that -- those determinations I'm required to

7      consider certain factors set forth in 18 U.S.C. Section

8      3142(g), the nature and circumstances of the offense that

9      weighs against your release.  The weight of the evidence

10     against you weighs against your release.  Your history and

11     characteristics individually, you have ties to the

12     community, you have family, I find that that would weigh in

13     favor of your release.  You don't have a significant

14     criminal history.

15          And then the nature and seriousness of the danger you

16     would pose to the community is the last factor that I am

17     required to consider, and I do think that you pose a

18     significant danger to the community.  Based on considering

19     those factors, I don't think I can set conditions which will

20     reasonably assure the safety of the community and your

21     future appearance.

22          I do think you're a significant risk of flight as well.

23     And so you're going to be detained pending further

24     proceedings.

25          All right.  In terms of those further proceedings with

respect to scheduling, Mr. Langs, your client still wishes
to have a preliminary hearing; is that correct?

MR. LANGS:  I think we already had one, Your
Honor.

THE COURT:  I felt like we covered it, but that's
your choice, you know.

MR. LANGS:  No.  If we do, I would certainly waive
without prejudice that that particular hearing I think we've
successfully achieved that.  But no, I would not call for a
preliminary hearing at this point, but I think we should
have a counsel determination.

THE COURT:  Okay.  So that will be Wednesday at 10
a.m. unless counsel has a problem with that.  Now would be
the time to raise that.  Wednesday, 10 a.m.?

MR. LANGS:  I'm duty on Wednesday so I'll be here.

THE COURT:  Okay.  Ms. Mesa?

MS. MESA:  Yes, Your Honor.  I'll be here.

THE COURT:  Okay.  All right.  Very well.  We'll
see you back here Wednesday at --

MS. MESA:  There is a couple -- one more matter.
The complaint has been filed at 9:30 this morning, and
I noticed after it was filed that there was one address that
was on there on page 7.

THE COURT:  Can you -- okay.  Page 7?

MS. MESA:  Correct.  I saw that --

```
1                    THE COURT:  The address towards the top there?
2                    MS. MESA:  That's correct.
3                    THE COURT:  Okay.
4                    MS. MESA:  So I would ask that the first complaint
5       be stricken from the record and a redacted complaint be put
6       in its place.
7                    THE COURT:  Mr. Langs, any position on that?
8                    MR. LANGS:  Um, isn't that the home address?  It's
9       public record.
10                   MS. MESA:  Yes.  It should be redacted.
11                   THE COURT:  Well that type of information is
12      ordinarily redacted, but if there's no objection to leaving
13      it in the public record --
14                   MR. LANGS:  No.  If the government wants it
15      redacted I certainly don't have a problem with that.
16                   THE COURT:  Okay.  So you have no opposition?
17                   MR. LANGS:  No.
18                   THE COURT:  All right.  So I'll ask you to file a
19      motion.  Okay?  Would you file a motion --
20                   MS. MESA:  Absolutely.
21                   THE COURT:  -- that you can represent based on
22      what Mr. Langs said here today, it's unopposed.  Please run
23      it by Mr. Langs before you go ahead and file it
24      electronically just so he has the opportunity to review it
25      one last time.  Okay?
```

1          MS. MESA:  Yes.  Thank you, Your Honor.  That's

2     it.

3          THE COURT:  That's it?

4          MR. LANGS:  All set.

5          THE COURT:  All right.  Thank you.  We're

6     adjourned.

7               (Hearing concluded at 1:54 p.m.)

8                    C E R T I F I C A T E

9          I certify that the foregoing is a correct

10    transcript from the record of proceedings in the

11    above-entitled matter.

12

13    s\Sandra K. Tremel          November 16, 2012

14

15

16

17

18

19

20

21

22

23

24

25