IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Orlando Division

CASE NO. 6:12-cr-00261-JA-KRS-1

UNITED STATES OF AMERICA

          Plaintiff,

v.

BRUCE LEE JENNINGS

          Defendant.

_____/

MOTION TO ADMIT POLYGRAPH EVIDENCE

Defendant, BRUCE LEE JENNINGS, through counsel and  pursuant to Fed. R. Crim. P. 47(a), Fed. R. Evid. 608 and 702, and the Due Process Clause of the United States Constitution, respectfully moves for admission of relevant polygraph evidence at his sentencing hearing and, in support, states:

1.     At the detention hearing in Mr. Jennings' case, reference was made to reported allegations that he had traveled outside the country to engage in sexual activity with minors.  *See* Transcript of Detention Hearing, at page 52 and 60.

2.     Jennings was detained without bond and that allegation was likely of great concern to the Magistrate judge on the issue of dangerousness, and understandably so.

3.     If true, such an allegation would also directly and heavily impact the extent to which a sentencing court would consider it necessary to fashion a sentence geared toward "protect[ing] the public from further crimes of the defendant."  *See* 18 U.S.C. § 3553(a)(2)(C).

4.     But the allegation is not true, and to prove its falsity, Jennings submitted to a

polygraph examination.

5.   Jennings passed the polygraph examination wherein he: (1) denied ever going overseas to have sex with someone under the age of 18; (2) denied ever knowingly having sex with someone under the age of 18 while overseas; and (3) denied ever using a trip overseas, or ever using the internet, to solicit someone under the age of 18 for a sexual encounter.  *See*  Copy of Polygraph Report and Copy of Dr. Palmatier's *curriculum vitae*, at p. 3. (attached as Composite Exhibit 1).

6.   Per the polygraph report, there was an overall probability of 99.9% that Jennings was being truthful when he denied engaging in such conduct.

7.   The polygraph was administered by Dr. John Palmatier, Ph.D., a highly trained, experienced and reputable polygrapher with Slattery Associates, Inc., in Miami, Florida.  *See* Exhibits 1.

8.   The true facts underlying this case are troubling enough without the exacerbation of inflammatory falsehoods being strewn about the record.

9.   Jennings therefore offers the results of the polygraph examination in an effort to refute the false and damaging allegation that he has had physical contact with minors.

10.   The fact that Jennings' denial is corroborated by scientific evidence from a trustworthy examination by a reputable polygrapher is highly relevant.

11.   Given the gravity of this case and the high stakes involved, Due Process and fundamental fairness require that Jennings be afforded the opportunity to corroborate his naked word with the only reliable evidence to which he can resort.

WHEREFORE, Jennings respectfully moves the Court to admit and consider the results of his polygraph examination.

MEMORANDUM OF LAW

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citations omitted).  In the Eleventh Circuit, polygraph evidence is admissible to corroborate the testimony of a witness.  *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir. 1989).  Jennings's polygraph examination results speak directly to an issue of critical importance in the under 18 U.S.C. § 3553 – the extent to which the public needs to be protected from future crimes.  *See* 18 U.S.C. § 3553(a)(2)(C).  As such, the polygraph evidence is relevant because it has the tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence.  *See* Fed. R. Evid. 401.  Justice Potter Stewart admonished that "[a]ny rule that impedes the discovery of truth in a court of law impedes as well the doing of justice." *Hawkins v. United States*, 358 U.S. 74, 81 (1958) (Stewart, J., concurring).  The doing of justice would be impeded if a blind eye were to be turned toward Jennings's polygraph results – relevant and admissible evidence which should be given due weigh and measured against whatever contradicting evidence exists.

More than twenty years ago, when *Piccinonna* was decided, the Eleventh Circuit recognized that "the science of polygraphy has progressed to a level of acceptance sufficient to allow the use of polygraph evidence in limited circumstances where the danger of unfair prejudice is minimized." *Piccinonna*, at 1537; *see also United States v. Crumby*, 895 F.Supp.1354, 1357 (D. Ariz. 1995) (noting Eleventh Circuit's view that "advances in

-3-

the science of polygraph have greatly increased the reliability of the tests and consequently reduced many of the prejudicial effects"). The *Piccinonna* Court held that "a per se rule disallowing polygraph evidence is no longer warranted", *Piccinonna*, at 1535. It declared there to be "no question that in recent years polygraph testing has gained increasingly widespread acceptance as a useful and reliable scientific tool" *Id*., at 1535, and acknowledged the admissibility of polygraph testimony to be an "increasingly important issue". *Id*, at 1537.

### The Prerequisites to Admission of Polygraph Evidence

Under *Piccinonna*, polygraph evidence is admissible to impeach or corroborate the testimony of a witness. *Id.* at 1536. If the Government persists in advancing the allegation that Jennings traveled outside the country to engage in sexual activity with minors, Jennings would offer sworn testimony to the contrary and offer the polygraph report to corroborate his word.

There are three conditions to admission of polygraph evidence to corroborate a witness: (A) the party planning to use the evidence must provide adequate notice to the opposing party that the expert testimony will be offered; (B) the opposing party must be given a reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions; and (C) the polygraph evidence must satisfy the Federal Rules of Evidence. *Id.*

### Adequate Notice and Reasonable Opportunity

The first two prerequisites to admission of polygraph results under *Piccinonna* are adequate notice and a reasonable opportunity for the opposing party to conduct it's own

examination. With sentencing schedule for May 30, 2013, Jennings submits that the Government is hereby being afforded adequate notice of his intent to seek admission of polygraph evidence and a reasonable opportunity to conduct its own examination on the same topic if it so desires.   The process that undersigned had to undertake to to get authorization for Jennings polygraph took approximately 48 hours

Jennings welcomes the Government to pursue discovery of the truth as to this disputed issue by subjecting Jennings to a polygraph examination instead of relying upon uncorroborated hearsay.

Federal Rules of Evidence

The third requirement for the admissibility of polygraph evidence is that the polygraph evidence satisfy the Federal Rules of Evidence.

1.      Rule 608

In *Piccinonna*, the Eleventh Circuit specifically referenced Rule 608 as a rule that must be satisfied:

> For example, Rule 608 limits the use of opinion or reputation evidence to establish the credibility of a witness in the following way: '[E]vidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.' Thus, evidence that a witness passed a polygraph examination, used to corroborate that witness's in-court testimony, would not be admissible under Rule 608 unless or until the credibility of that witness were first attacked.

885 F.2d at 1536.  If the Government abandons the false allegations concerning Jennings traveling outside the country to engage in sexual activity with minors, the issue of admission of the polygraph evidence is moot.  However, if the Government pursues, or even references the allegations, Jennings will testify to the contrary.  If the Government

then concedes the issues, admission of the polygraph reports is again moot.  But if the prosecution attacks the veracity of Jennings's testimony through cross-examination and/or by admission of testimonial evidence to the contrary, then Rule 608's predicate to admission has been laid.  *See United States v. Padilla*, 908 F.Supp. 923, 928 (S.D. Fla. 1995) (admitting polygraph evidence and stating that, consistent with Fed. R. Evid. 608(a), "once a witness' character for truthfulness or credibility has been attacked, a polygraph expert may introduce testimony as to that witness' character for truthfulness based on the results of a polygraph examination").

> 2.      Rule 702

*Piccinonna* was decided before the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Nonetheless, in order to be admissible, polygraph evidence must comply with the requirements of Rule 702 and *Daubert*.  *See United States v. Gilliard*, 133 F.3d 809, 812 (11th Cir. 1998).  In *Daubert*, the Supreme Court held that expert scientific testimony is only admissible if it constitutes scientific knowledge and would assist the trier of fact in understanding the evidence or determining a fact in issue.  *Id.* at 589-91.  Both *Daubert* prerequisites are satisfied here.

> Scientific Knowledge

A technique constitutes scientific knowledge if: (1) the technique can be and has been tested; (2) the technique has been subjected to peer review and publication; (3) there is a known or potential rate of error; (4) standards controlling the technique's operation exist and are maintained; and (5) the technique has attained general acceptance within the relevant scientific community.  *Piccinonna,* at 593-94.  On theses bases, the techniques

employed by Dr. Palmitier and the theories upon which they are predicated, qualify as scientific knowledge.

In the view of the Eleventh Circuit, polygraph tests had already "possess[ed] enough scientific rigor to form an acceptable basis for expert opinion" as of Twenty four years ago. *Padilla*, 908 F.Supp. at 929.  Judge Atkins of the Southern District explained that

> "[b]y eradicating this circuit's *per se* ban on polygraph evidence, the Court of Appeals made an explicit determination that polygraph tests are sufficiently reliable to form the basis for expert testimony.  Therefore, district courts have been left with the task of determining whether the specific examination has been conducted in accordance with acceptable principles so as to make *it* a sufficiently reliable basis for expert opinions in each case."

*Id.* (emphasis in original).

Dr. Palmatier is a qualified expert in the field of polygraph examinations who conducted the examination in accordance with accepted principles.  Moreover, the specific technique utilized by the expert in this case has already been recognized by the Eleventh Circuit and the government as scientifically valid.  *Gilliard*, 133 F.3d at 813.  "The first, and apparently the most tested and most widely used [control question technique], is called the probable lie control question technique*.  The Government concedes that this technique, if properly utilized, has been recognized in the scientific community as being 'good science.'"* *Id.* (emphasis added).

Each *Daubert* consideration is addressed in detail below.  First, the technique can be and has been tested.  *See, e.g., Galbreth*, 908 F.Supp. at 885-86; *Crumby*, 895 F.Supp. at 1359.  In fact, as of 1995, hundreds of studies had been conducted regarding the scientific hypothesis underlying the probable lie control question technique.  *Galbreth*, 908

F.Supp. at 885. "On the whole, these high quality studies support the hypothesis underlying the control question technique." *Id.* Overall, "not only is it possible to test whether these polygraph techniques can accurately detect truth or deception, but, in fact, the techniques have actually been tested." *Id.* at 891; *see also Crumby*, 895 F.Supp. at 1359 ("In short, Dr. Raskin and the numerous authorities cited by Defendant strongly support the view that the science of polygraphy has been subjected to vigorous scientific testing and the assumptions underpinning the science have been deeply analyzed by those in the field of polygraphy and psychophysiology.").

In addition to being subjected to rigorous testing, scientists have also compared polygraph science to other scientific evidence traditionally admitted in criminal cases. *See* J. Widacki & F. Horvath, *An Experimental Investigation of the Relative Validity and Utility of the Polygraph Technique and Three Other Common Methods of Criminal Identification*, 23 J. Forensic Sci. 596 (1978) (attached as Exhibit E). The results of this comparative analysis demonstrate that polygraph evidence is more reliable than handwriting expert testimony, eyewitness testimony, and fingerprint testimony. In the test, eighty volunteers participated in an experiment testing the ability of lay witnesses and expert witnesses to identify perpetrators out of four groups of twenty subjects. The results proved that, excluding inconclusives, the fingerprint expert was correct 100% of the time,  the polygrapher was correct in 95% of the time, the handwriting expert 94%  and the eyewitness 64%. Moreover, when inconclusives were included, the percentage of correct decisions was 90% for the polygraph examiner, 85% for the handwriting expert, 35% for the eyewitness, and 20% for the fingerprint expert.

In another recent study, polygraph evidence was compared to other medical and psychological diagnostic tools. *See* Crewson, *Comparative Analysis of Polygraph With Other Screening and Diagnostic Tools*, 32 Polygraph 2 (2003) (attached as Exhibit F). Crewson concluded that polygraph evidence, in specific-issue testing, had a similar accuracy to diagnostic radiology and better accuracy than various medical and psychological tools, including MRIs and x-rays targeting breast cancer and multiple sclerosis, and DSM-IV analyses for personality disorders and depression. *Id.* at 63.

Second, the probable lie control question technique has been subjected to peer review and publication. There have been hundreds of articles published on the probable lie control question technique. *Galbreth*, 908 F.Supp. at 891. "Many of these articles have been published in peer-reviewed journals and otherwise subjected to the scrutiny of the scientific community." *Id.*; *see also Crumby*, 895 F.Supp. at 1359 ("The Court finds that the science of polygraphy and its underlying scientific principles have been subjected to extensive peer review and publication.").

Third, the probable lie control question technique has a known rate of error and it's very low. *See Crumby*, 895 F.Supp. at 1359 ("The known error rates for the science of polygraphy are remarkably low."). As of 1995, "where the exams are properly conducted, where the numerical scoring system is employed, and where the examiner is highly qualified," "the known rate of error [was] approximately 10% with innocent subjects, i.e., false-positive errors, and 5% with guilty subjects, i.e., false negative errors." *Galbreth*, 908 F.Supp. at 892.

A false-negative occurs when a deceptive examinee is reported as being truthful.

Here, the expert did not detect any indication that Jennings was being deceptive and found

him to be truthful.  Therefore, the rate of error with such a negative finding is, at most, 5%.

In other words, there is a 95% chance that Jennings is telling the truth when he denies ever

having physical contact with a minor of a sexual nature.

Fourth, the probable lie control question technique is subject to standards controlling

its operation. The American Polygraph Association ("APA"), "which has about 2,500

members, accredits schools of polygraphy, screens its members and administers written

and oral tests to graduates to assure an established level of competency. Standard test

protocol calls for pre-test collection of data, a pre-test interview, administration of the test

questions (usually in a control question format) and a post-test interview. In addition, the

APA sanctions members who do not follow enumerated testing procedures." *United States*

*v. Posado*, 57 F.3d 428, 434 & n.9 (5th Cir. 1995) (also noting that "there is good indication

that polygraph technique and the requirements for professional polygraphists are becoming

progressively more standardized"); *see also Piccinonno*, 885 F.3d at 1533 n.13 ("The

American Polygraph Association and state organizations have standards in their charters

which their members must follow as well.").   The New Mexico Supreme Court described

the APA's standards as follows:

> Under these standards, prior to examination, the
> polygraph examiner must make a reasonable
> effort to determine whether an examinee is fit for
> polygraph testing by inquiring into the medical
> and psychological condition of the examinee, as
> well as any recent drug use by the examinee,
> APA Standard 3.4.1; the polygraph instruments
> must be APA approved and have been
> calibrated, APA Standard 3.5; and a pretest
> interview must be conducted where the examiner
> both discusses with the examinee the polygraph

> process and the issues to be tested and ensures
> that the examinee recognizes and understands
> each question, APA Standard 3.8. During the
> examination, the questions used must be clear
> and distinct, APA Standard 3.9.3; the questions
> used must be balanced in terms of length and
> impact, APA Standard 3.9.4; the examiner must
> collect a sufficient number of charts, APA
> Standard 3.9.5; standardized chart markings
> should be used, APA Standard 3.9.7; and either
> an audio or audio/video recording of the pretest
> and in-test phase of the examination must be
> made, APA Standard 3.9.8. As for scoring the
> chart, the examiner must use numerical scoring,
> APA Standard 3.10.1; and the examiner's notes
> must have 'sufficient clarity and precision so
> that another examiner could read them,' APA
> Standard 3.10.2.

*Lee v. Martinez*, 96 P.3d 291, 304 (N.M. 2004).

The American Association for Police Polygraphists has also set out standards of practice and ethics. *See* www.policepolygraph.org/standards.htm.  And many states have licensing regulations in place for polygraphers.  *Galbreth*, 908 F.Supp. at 892.  In the federal sector, in order to practice as a polygraph examiner for a federal agency, an individual must attend a polygraph school, usually the Department of Defense Polygraph Institute (which is discussed in more detail below), and must receive a certificate before he/she can administer examinations.  Additionally, most of the federal agencies have quality control programs where examiners' work is reviewed periodically.  *Id.*

Fifth, the probable lie control question technique has attained general acceptance within the relevant scientific community.  Though the Supreme Court made clear that "general acceptance" is no longer an absolute prerequisite to admissibility, *Daubert*, 509 U.S. at 588-89, it is, nonetheless, satisfied where it comes to polygraph evidence.  Various

surveys regarding the general acceptance in the relevant community have been conducted and demonstrate that polygraph evidence is accepted within the psychophysiological community. *See* The Gallup Organization, *Survey of Members of Society for Psychological Research Concerning Their Opinion of Polygraph Test Interpretation*, 13 Polygraph 153 (1984);  (attached as Exhibit G); Susan L. Amato & Charles Honts, *A Survey of Members of the Society for Psychophysiological Research Regarding the Polygraph* (1993) (attached as Exhibit H).   Based on these surveys and studies, courts have concluded that "use of polygraph evidence is widespread" and that polygraph evidence is generally accepted within the professional community.   *Crumby*, 895 F.Supp. at 1360 (stating that the Amato/Honts survey "suggests that there is a large community of psychophysiologists who accept and endorse the use of polygraph examinations in a variety of circumstances"); *see also Galbreth*, 908 F.Supp. at 892-93.   The *Galbreth* Court specifically considered the validity of the control question technique, and said: "for purposes of meaningfully accessing the scientific validity of the control question technique, this Court has considered the degree of acceptance amongst well-informed members of the relevant scientific community.   The Court finds the high degree of acceptance within this group to be particularly indicative of reliability."   908 F.Supp at 893.

Polygraph examinations have also gained general acceptance within the federal government. *See United States v. Rafael Davila*, CR-03-021-RHW at 8 (E.D. Wash. April 22, 2005) (unpublished).[1]   In 1986, the Department of Defense Polygraph Institute was created.   The Institute is a federally funded institution providing graduate and continuing

---

[1]

education courses in forensic psychophysiology.  Its mission is four-fold: to (1) qualify Department of Defense and other federal personnel for careers as psychophysiological detection of deception (PDD) examiners; (2) provide continuous research in forensic psychophysiology and credibility assessment methods; (3) manage the PDD continuing education certification program for federal agencies; and (4) manage the Quality Assurance Program that develops, implements, and provides oversight of PDD standards for federal polygraph programs. DoDPI Mission,*at* http://www.dodpi.army.mil/mission.asp (last visited April 16, 2008).

The Institute developed a curriculum and improved instruction of federal polygraph examiners.  The Institute also set up a strict quality assurance program that was initially published in 1998 in a handbook.  *See* Quality Assurance Program, *at* http://www.dodpi.army.mil/div_QAP.asp (last visited April 16, 2008).  The Institute also has a research division that supports a wide variety of research projects in an effort to achieve its mission.  As of 2005, there were at least 600 polygraph examiners employed by the federal government.  At least 25 different federal agencies routinely conduct polygraph examinations.  And recent reports to Congress state that at least 11,000 polygraph examinations are conducted by these federal agencies each year.  This statistic does not include examinations conducted by the National Security Agency (NSA) involving classified information. *Davila*, CR-03-021-RHW at 9.  The Department of Defense relies so heavily on polygraph examinations that it has stated that: "[t]he polygraph is clearly one of our most effective investigative tools."  Department of Defense, Annual Polygraph  Report to Congress at 1 (2000) (attached as Exhibit J).  The importance of the polygraph to the Department of Defense and our national security cannot be understated:

> [t]he Department of Defense has used the polygraph for almost half a century. It is used in criminal investigations, counterintelligence cases, foreign intelligence and counterintelligence operations, exculpation requests, and as a condition for access to certain positions or information. The polygraph is a tool that enhances the interview and interrogation process. Often it is the only investigative technique capable of providing essential information to resolve national security issues and criminal investigations.

*Id.* Argument by any branch of the federal government that polygraphs are unreliable, when so many branches of that government rely so heavily upon them, would be disingenuous. Since *Piccinonna*, when the scientific integrity of polygraph science was recognized by the Eleventh Circuit, the validity, testing, acceptance, and standards regarding polygraph science has only continued to evolve, standards have been further developed, and polygraphy has become an even more validated and accepted science. Polygraph evidence in the twenty-first century therefore clearly satisfies all of the requirements of *Daubert* and is admissible evidence under Fed. R. Evid. 702.

Finally, the argument against admission of polygraph evidence in a court setting which prevailed for so many years, is that it weighed too heavily with the jury. There will be no jury at Jennings' sentencing hearing. And given this Court's extensive experience as an arbiter, Jennings is confident in its ability not to be unduly persuaded but, instead, to assign the polygraph evidence the weight it deserves *vis a vis* whatever other evidence is offered on the subject.

## CONCLUSION

For all the foregoing reasons, Jennings respectfully moves for admission of the polygraph test results at his sentencing.

Respectfully submitted,


/s/ *David A. Howard*
David A. Howard, Esq.
Fla. Bar No. 956589
25 SE 2nd Avenue, Ste. 1100
Miami, Florida 33131
Tel. (786) 360-6056


## CERTIFICATE OF SERVICE

I DO HEREBY CERTIFY that a true and correct copy of the foregoing was served

upon all counsel of record *via* the Court Electronic Filing System on this 16th day of May,

2013.

*s/ David A. Howard*
David A. Howard